**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


| | | |
|---|---|---|
| ERICA MCLUCAS SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14CV163 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |


**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Erica McLucas Sanders, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying a claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Court has before it the certified administrative record (cited herein as "Tr. __"), as well as the parties' cross-motions for judgment (Docket Entries 11, 12). For the reasons that follow, the Court should enter judgment for Defendant.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB, alleging a disability onset date of September 8, 2009. (Tr. 170-78.) Upon denial of that application initially (Tr. 71-80, 117-25) and on reconsideration (Tr. 81-93, 128-35), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 136-37). At the outset of the hearing, Plaintiff amended her onset date to

August 31, 2011, due to her receipt of unemployment compensation through that date. (Tr. 21, 164.) Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 17-70.) By decision dated September 21, 2012, the ALJ determined that Plaintiff was not disabled under the Act. (Tr. 94-108.) On January 7, 2014, the Appeals Council denied Plaintiff's request for review (Tr. 1-6), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the [] Act through December 31, 2014.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since August 31, 2011, the amended alleged onset date.
>
> 3. [Plaintiff] has the following severe impairments: bilateral patella chondromalacia; left shoulder pain (bursitis); foot pain from gout; bilateral osteoarthrosis; and depression.
>
> . . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> . . . .
>
> 5. . . . [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except [Plaintiff] can occasionally reach overhead; can occasionally climb, stoop, kneel, crouch, and crawl; and can perform simple routine repetitive tasks.

. . . .

6.   [Plaintiff] is unable to perform any past relevant
     work.

. . . .

10.  Considering [Plaintiff's] age, education, work
     experience, and residual functional capacity, there
     are jobs that exist in significant numbers in the
     national economy that [Plaintiff] can perform.

. . . .

11.  [Plaintiff] has not been under a disability, as
     defined in the [] Act, from September 8, 2009,
     through the date of this decision.

(Tr. 99-107 (internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security

Commissioner's denial of social security benefits."  Hines v.

Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope

of [judicial] review of [such a] decision . . . is extremely

limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."

Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead,

the Court "must uphold the factual findings of the ALJ if they are

supported by substantial evidence and were reached through

application of the correct legal standard."  Hines, 453 F.3d at 561

(internal brackets and quotation marks omitted).  "Substantial

evidence means 'such relevant evidence as a reasonable mind might

3

accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving

a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" <u>Id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[1]  "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition."  <u>Id.</u>  "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled."  <u>Id.</u> (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps:  "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity

---

[1] The Act "comprises two disability benefits programs.  [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. Supplemental Security Income . . . provides benefits to indigent disabled persons.  The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical."  <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

to (4) perform [the claimant's] past work or (5) any other work."
Albright v. Comm'r of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2
(4th Cir. 1999).[2]  A finding adverse to the claimant at any of
several points in the SEP forecloses an award and ends the inquiry.
For example, "[t]he first step determines whether the claimant is
engaged in 'substantial gainful activity.' If the claimant is
working, benefits are denied.  The second step determines if the
claimant is 'severely' disabled.  If not, benefits are denied."
Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at
each of the first three steps, the "claimant is disabled." Mastro,
270 F.3d at 177.  Alternatively, if a claimant clears steps one and
two, but falters at step three, *i.e.*, "[i]f a claimant's impairment
is not sufficiently severe to equal or exceed a listed impairment,
the ALJ must assess the claimant's residual functional capacity
('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess
whether, based on that RFC, the claimant can perform past relevant

---

[2] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

work; if so, the claimant does not qualify as disabled. <u>Id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff contends that the Court should overturn the ALJ's finding of no disability on these grounds:

1) the ALJ failed to render an RFC supported by substantial evidence due to improper evaluation of the opinions of a treating physician (Docket Entry 10 at 11-13);

(2) as part of the RFC formulation, the ALJ erroneously evaluated Plaintiff's symptom reporting (<u>id.</u> at 13-14); and

---

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

(3) at step five, the ALJ relied upon VE testimony offered in response to an incomplete hypothetical question (id. at 14-15).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 13 at 6-19.)

## 1. RFC and Treating Physician Opinions

In her first assignment of error, Plaintiff challenges the ALJ's RFC formulation, contending that the ALJ should have given the more restrictive opinions of Plaintiff's primary care physician, Dr. Melissa Gilmer Scott, "significant, if not controlling, weight." (Docket Entry 10 at 11.) In particular, Plaintiff asserts that Dr. Scott's opinions reflect consistency with other medical evidence of record, including orthopedist Dr. Brian Szura's prediction that "'it is likely that [Plaintiff] is going to require some type of surgical intervention'" (id. at 11-12 (quoting Tr. 279)), orthopedist Dr. Ganesh V. Kamath's recommendation of "repeated cortisone injections" (id. at 12 (citing Tr. 310)), and consultative psychiatrist Dr. Scott T. Schell's observation that Plaintiff "walked with a limp and cried throughout the majority of the examination" (id. (citing Tr. 334)). Plaintiff further argues that the ALJ erred by discounting Dr. Scott's opinions regarding Plaintiff's limitations from depression "on the basis that [Dr. Scott] was not a mental health specialist." (Id. at 12.) Plaintiff's arguments fall short.

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). The rule also recognizes, however, that not all treating sources or treating source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords it. 20 C.F.R. § 404.1527(c)(2)(ii). Moreover, as subsections (2) through (4) of the rule describe in great detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590 (emphasis added). Finally, opinions by physicians regarding the ultimate issue of disability and other such findings dispositive of a case

do not receive controlling weight because the Commissioner retains the authority to render such decisions. 20 C.F.R. § 404.1527(e).

From June 26, 2010, to June 7, 2012, Dr. Scott completed five RFC questionnaires (three physical and two mental) on forms prepared by Plaintiff's attorney. (<u>See</u> Tr. 296-97, 327-31, 377-78, 381-83.)[5] Dr. Scott reported that Plaintiff suffered from patellofemoral malalignment with chondromalacia, bursitis, gout, and depression. (Tr. 296, 327, 377.) As a result of these impairments, Dr. Scott opined that Plaintiff could perform less than a full range of sedentary work (including significant limitations in her ability to walk, sit, stand, lift/carry, manipulate, and reach; a need to lie down during an eight-hour workday in excess of standard breaks; and illness-related absence more than four times per month). (Tr. 296-97, 327-28, 377-78.) From a mental perspective, Dr. Scott assessed moderate to extreme limitations in Plaintiff's ability to understand and remember, to sustain attention and concentration, and to adapt in work-related situations. (Tr. 329-31, 381-83.)

Here, the ALJ's evaluation of Dr. Scott's opinions complied with the regulatory requirements. The ALJ first reviewed Plaintiff's medical records, including Dr. Scott's treatment notes.

---

[5] Dr. Scott also provided a "To Whom It May Concern" letter, dated June 7, 2012, which concluded that "due to chronic pain and worsening depression over the past years [Plaintiff] is unable to work any significant amount of hours." (Tr. 374.)

(Tr. 102-03.)  The ALJ then discussed Dr. Scott's opinions and assessed them as follows:

> The undersigned gives partial weight to Dr. Scott's opinion, but only to the extent that [Plaintiff] was capable of performing work at less than the full range of sedentary work.  The undersigned finds that to that extent, Dr. Scott's opinion was consistent with the objective medical evidence, which showed that [Plaintiff] was diagnosed with depression and her physical examinations and diagnostic tests were generally mild to unremarkable; except that a diagnostic test of her cervical spine showed[] she had mild to moderate degenerative changes . . . . Although Dr. Scott had a long treatment relationship with [Plaintiff], the undersigned did not give greater weight to her opinion because the overall evidence of record did not support such marked to extreme mental limitations, and she was not a mental health specialist.

(Id.)

The record reflects that the ALJ properly discounted Dr. Scott's opinions largely based on the fact that her own treatment notes failed to support her opinions (particularly as to mental issues).  (See Tr. 103.)  Additionally, in accord with the regulations, the ALJ permissibly found Dr. Scott's opinions inconsistent with other medical evidence (id.), such as diagnostic tests showing only mild to moderate degenerative changes in Plaintiff's cervical spine and negative findings regarding her right ankle, as well as "generally unremarkable" physical examinations with some tenderness in Plaintiff's knees and left shoulder but good range of motion, full strength, normal sensation, ligamentous stability, normal gait and posture, and normal mood and affect (see Tr. 102; see also Tr. 278, 280, 291, 304, 310-11, 316,

318, 320, 361-64, 366-67, 369-70, 385-87, 389-92). Further, neither of the statements by Drs. Szura and Kamath (which Plaintiff cites as support for Dr. Scott's prescribed restrictions) expresses any opinion regarding functional limitations. Similarly, although Dr. Schell observed that Plaintiff walked with a limp and cried throughout an examination (Tr. 334), that one-time observation does not negate the ALJ's conclusion that the more extreme of Dr. Scott's opinions about Plaintiff's limitations lacked consistency with other medical evidence of record.

Nor, contrary to Plaintiff's argument, did the ALJ err by discounting Dr. Scott's opinion on the basis that she lacked expertise in mental health treatment. (Docket Entry 10 at 12 (citing Tr. 103).) The regulations expressly require the ALJ to assess the area of speciality of physicians who offer opinions. See 20 C.F.R. § 404.1527(c)(5). Moreover, Dr. Schell's opinion that Plaintiff's physical and mental impairments "adversely influenced" her ability to perform simple repetitive tasks, form working relationships with others, and tolerate work stress (Tr. 337), did not render erroneous the ALJ's decision to discount Dr. Scott's opinion. The ALJ discussed Dr. Schell's opinion and gave it "partial weight." (Tr. 103-04.) The ALJ found that Dr. Schell's "adversely influenced" opinion did not sufficiently express actual functional abilities and limitations (Tr. 104), and additionally noted that Dr. Schell had assigned a Global Assessment

of Functioning ("GAF") for the past year of 64 and 60 on examination, indicating only mild symptoms during the past year and moderate symptoms on examination (Tr. 103, 105 (citing Tr. 336)).[6]

Under these circumstances, the ALJ's handling of Dr. Scott's opinions provides Plaintiff with no basis for relief.

## 2. Credibility Assessment

At the hearing before the ALJ, Plaintiff testified, inter alia, that knee pain and depression kept her from working, in that they "limited her to standing no more than 30 minutes at a time, walking less than a block, sitting no more than one hour at a time, lifting no more than 1-pounds [sic], and focusing no more than 30 to 40 minutes." (Tr. 101.) The ALJ found that Plaintiff "was not as limited as alleged, and that she was capable of performing less than the full range of sedentary work as noted [in the RFC formulation]." (Tr. 104.) Plaintiff argues that the ALJ erred in finding Plaintiff's symptom reporting not entirely credible. (Docket Entry 10 at 13-14.) Specifically, according to Plaintiff, the ALJ "ignore[d] notes in the record which contradict [his

---

[6] The GAF uses a 100-point scale to show an individual's functional level. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000). A GAF of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." Id. at 34. A GAF of 61 to 70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id. A new edition of the leading treatise discontinued use of the GAF. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

description of her mental status examinations as 'unremarkable'].”
(Id. at 13.)  Plaintiff also objects to the ALJ's reliance on his
finding “that Plaintiff's 'conservative' treatment of her knee pain
suggested that her symptoms were not as severe as alleged.” (Id.
at 14.)  This assignment of error lacks merit.

Social Security Ruling 96-7p, Policy Interpretation Ruling
Titles II and XVI: Evaluation of Symptoms in Disability Claims:
Assessing the Credibility of an Individual's Statements (“SSR 96-
7p”), as applied by the Fourth Circuit in Craig, 76 F.3d at 594-95,
provides a two-part test for evaluating a claimant's statement
about symptoms.  “First, there must be objective medical evidence
showing 'the existence of a medical impairment(s) which results
from anatomical, physiological, or psychological abnormalities and
which could reasonably be expected to produce the pain or other
symptoms alleged.'”  Id. at 594 (quoting 20 C.F.R. § 404.1529(b)).

If a claimant meets that threshold obligation, the fact finder
must proceed to part two and evaluate the intensity and persistence
of the claimant's pain, as well as the extent to which it affects
her ability to work.  Id. at 595.  In making this evaluation, the
fact finder:

> must take into account not only the claimant's statements
> about her pain, but also all the available evidence,
> including the claimant's medical history, medical signs,
> and laboratory findings, any objective medical evidence
> of pain (such as evidence of reduced joint motion, muscle
> spasms, deteriorating tissues, redness, etc.), and any
> other evidence relevant to the severity of the
> impairment, such as evidence of the claimant's daily

activities, specific descriptions of the pain, and any
medical treatment taken to alleviate it.

Id. (internal citations and quotation marks omitted).

As part of that analysis, the ALJ need not recount each piece
of evidence. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir.
1993). However, the ALJ has the responsibility to draw inferences
from, and resolve conflicts in, the record. Hammond v. Heckler,
765 F.2d 424, 426 (4th Cir. 1985) (citing Smith v. Schweiker, 719
F.2d 723, 725 n.2 (4th Cir. 1984)). "'Where conflicting evidence
allows reasonable minds to differ as to whether a claimant is
disabled, the responsibility for that decision falls on the
[Commissioner] (or the ALJ).'" Mastro, 270 F.3d at 179 (quoting
Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). When
challenging an ALJ's exercise of that authority, a plaintiff must
show that the ALJ either ignored crucial portions of the record or
reached an obviously unreasonable conclusion given the evidence in
the record. Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir.
1984); Basu-Dugan v. Astrue, No. 1:06CV00007, 2008 WL 3413296, at
*6 (M.D.N.C. Aug. 8, 2008) (unpublished).

Here, the ALJ found at part one of the credibility inquiry
that Plaintiff had impairments that could reasonably be expected to
cause her alleged symptoms. (Tr. 104.)[7] Proceeding to part two,
the ALJ found, however, that "[Plaintiff's] statements concerning

---

[7] Plaintiff has not alleged any error with respect to this part of the
credibility inquiry. (See Docket Entry 10 at 13-14.)

15

the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." (Id.)  In making that part two finding, the ALJ stated that "physical examinations generally showed that [Plaintiff] was well developed, not in acute distress, alert and oriented, her mood and affect were appropriate, her knees had good active range of motion with no ligamentous instability; she was neurovascularly intact distally with 5/5 strength, and her gait and station were intact." (Id.)

As further concerns reported knee pain, the ALJ observed that diagnostic reports showed only mild degeneration in one knee. (Id.)  Additionally, the ALJ "note[d] that [Plaintiff's] overall treatment of her physical impairments was generally conservative, with no hospitalizations or emergency care . . . ." (Id. (emphasis added); see also Tr. 102 ("Her treatment has included steroid injections, wearing braces, and physical therapy for her bilateral knee impairment, . . . strengthening exercises at home, and medications." (internal citations omitted)).)  In light of the foregoing considerations, the ALJ concluded that Plaintiff's "symptoms from her physical impairments were not as limiting or severe as alleged and that [she] was capable of functioning at a higher exertional level." (Id. at 104.)  Nonetheless, the ALJ credited Plaintiff's symptom reporting as to her physical condition to a significant extent "by limiting her to sedentary exertional

work, with further postural and manipulative restrictions as noted [in the RFC formulation]."  (Id.)

Similarly, the ALJ emphasized that "[t]he overall evidence of record showed that [Plaintiff's] mental impairments placed mild limitations on her activities of daily living and social functioning, and moderate limitations in concentration, persistence, or pace."  (Tr. 105.)  The ALJ thereafter described Plaintiff's "mental status examinations" as "generally unremarkable, except that her mood was anxious and depressed at times."  (Id. (internal citations omitted) (emphasis added).)  "In addition, the [ALJ] note[d] that [Plaintiff's] overall treatment of her depression was conservative, with medication and no hospitalizations or emergency care."  (Id.)  Finally, the ALJ pointed out that "Dr. Schell, upon examining [Plaintiff], concluded that [her] mental symptoms had been mild for the previous year. Nevertheless, the [ALJ] took into consideration [Plaintiff's] diagnosis of depression [and] her subjective complaints and reasonably accommodated her by limiting her to simple routine repetitive tasks."  (Id. (internal citations omitted.))

The foregoing quotations from the ALJ's decision contradict Plaintiff's suggestion that the ALJ unreasonably resolved part two of the credibility analysis because the ALJ "attacked Plaintiff's credibility regarding her depression by stating that her mental status examinations were 'unremarkable.'" (Docket Entry 10 at 13.)

17

Rather, the ALJ described those examinations as "generally" unremarkable with an explicit exception noting that "at times" such examinations revealed that Plaintiff suffered from "anxious and depressed" moods. (Tr. 105.) Plaintiff cannot obtain relief by misstating the ALJ's findings. Moreover, the citations offered by Plaintiff regarding her mental examinations (see Docket Entry 10 at 13-14) do not invalidate the ALJ's actual findings on point, in light of the overall evidence of record.

The Court also should decline to grant relief in connection with Plaintiff's argument that "it was improper for the ALJ to impugn Plaintiff's credibility regarding her knee pain based on the assertion that she only underwent conservative treatment" (id. at 14). As an initial matter, Plaintiff has failed to make clear whether she contends the ALJ wrongly found that Plaintiff's knee treatment qualified as "conservative," the ALJ wrongly held Plaintiff's failure to pursue more aggressive treatment against her, or the ALJ wrongly did something else. (See id.) The Court could deny relief on that ground alone. See, e.g., Belk, Inc. v. Meyer Corp ., U.S., 679 F.3d 146, 152 n.4 (4th Cir. 2012) ("This issue is waived because [the plaintiff] fails to develop this argument to any extent in its brief."); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Nickelson v.

<u>Astrue</u>, No. 1:07CV783, 2009 WL 2243626, at *2 n.1 (M.D.N.C. July 27, 2009) (unpublished) ("[A]s [the plaintiff] failed to develop these arguments in his [b]rief, the court will not address them.").

To the extent the Court opts to consider this matter further, it should note that the ALJ never described Plaintiff's knee treatment as "conservative"; rather, as quoted above, the ALJ characterized the "overall treatment of [Plaintiff's] physical impairments" (not the specific treatment of her knees) as "generally conservative" (not entirely "conservative") and emphasized the absence of "hospitalizations or emergency care." Plaintiff has not shown any basis to question those actual statements made by the ALJ. (<u>See</u> Docket Entry 10 at 14.)[8] Nor did the ALJ ever indicate that Plaintiff's failure to undergo knee surgery impacted the credibility finding. (<u>See</u> Tr. 101-06.) Finally, the ALJ cited more than sufficient record support for its partial discounting of Plaintiff's report as to the disabling impact of her knee pain, including that "physical examinations generally showed that [she] was . . . not in acute distress, her knees had good active range of motion with no ligamentous instability . . ., and her gait and station were intact" (Tr. 104), as well as that she had required "no hospitalizations or emergency

---

[8] Moreover, in the context of knee pain, courts have characterized "physical therapy, cortisone injections, and pain medication" as "conservative treatment," <u>Sissom v. Colvin</u>, 512 F. App'x 762, 765-66 (10th Cir. 2013); <u>accord</u> <u>Polynice v. Colvin</u>, No. 8:12CV1381(DNH/ATB), 2013 WL 6086650, at *10 (N.D.N.Y. Nov. 19, 2013) (unpublished), <u>aff'd</u>, 576 F. App'x 28 (2d Cir. 2014).

care" (id.).  Simply put, as concerns Plaintiff's reported knee pain, the ALJ did not ignore crucial parts of the record or render a patently unreasonable credibility determination.  Shively, 739 F.2d at 989-90; Basu-Dugan, 2008 WL 3413296, at *6.

In sum, Plaintiff has established no reversible error in the ALJ's analysis of Plaintiff's symptom reporting.

## 3.   Hypothetical Question

Finally, Plaintiff asserts that "[t]he ALJ's errors in determining Plaintiff's RFC and credibility render the Step 5 determination unsupported by substantial evidence because these errors resulted in an incomplete hypothetical question asked to the VE." (Docket Entry 10 at 15.)  Plaintiff maintains that, "[i]n order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (Id. (citing Walker v. Bowen, 990 F.2d 47, 50 (4th Cir. 1989)).)  Plaintiff notes that, "when the VE was asked a hypothetical question which adopted the limitations opined to by Dr. Scott, [the VE] testified that Plaintiff could not perform any jobs. (Id. (citing Tr. 68).)

Plaintiff's third assignment of error thus relies entirely on the merits of her first two claims, i.e., that the ALJ erred by failing to adopt all of Dr. Scott's proposed restrictions and by improperly assessing Plaintiff's credibility.  However, as

discussed in the preceding subsections, those first two assignments of error lack merit. Accordingly, Plaintiff's third assignment of error also must fail.

### III. CONCLUSION

The record does not provide a basis to grant Plaintiff's request for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment (Docket Entry 11) be denied, that Defendant's Motion for Judgment (Docket Entry 12) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

February 4, 2015